UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| ANNIE TOVARES,<br><br>     Plaintiff,<br><br> vs.<br><br>GALLAGHER BASSETT SERVICES,<br>INC., AND PRAETORIAN INSURANCE<br>COMPANY,<br><br>     Defendants. | CIV. 16-5051-JLV<br><br><br>ORDER |

**INTRODUCTION**

Plaintiff Annie Tovares filed an action against the defendants Gallagher Bassett Services, Inc., and Praetorian Insurance Company alleging bad faith and misrepresentation in violation of South Dakota law.[1]  (Docket 1). Defendants filed separate amended answers to plaintiff's complaint.  (Dockets 85 & 86).  Defendants filed a second motion for summary judgment, together with a brief, two affidavits with six exhibits and defendants' statement of undisputed material facts.  (Dockets 114, 115, 116, 116-1 through 116-4, 117, 117-1 through 117-2 & 118).  Plaintiff filed a responsive brief, together with an affidavit with five exhibits, plaintiff's response to defendants' statement of undisputed facts and plaintiff's statement of material facts for which there is

---

[1]As a result of defendants' first motion for summary judgment, the court dismissed plaintiff's bad faith claim.  (Docket 87 at pp. 25 & 36).

an issue to be tried.   (Dockets 121, 122, 122-1 through 122-5, 123 & 125).

Defendants filed a reply brief, together with defendants' response to plaintiff's

statement of material facts and objections to exhibits in support of their motion

for summary judgment.   (Dockets 128 & 129).

For the reasons stated below, defendants' second motion for summary

judgment is denied.

## STANDARD OF REVIEW

In the order resolving defendant's first motion for summary judgment,

the court laid out in detail the standard of review for resolving a motion for

summary judgment.   (Docket 87 at pp. 2-4).   That standard of review is

incorporated by reference and will not be restated in this order.

## UNDISPUTED MATERIAL FACTS

The following recitation consists of the material facts developed from the

complaint (Docket 1), defendants' amended answers (Dockets 85 & 86),[2] the

parties' statements of undisputed material facts (Dockets 118, 123, 125 & 128)

and other evidence where indicated.[3]   Where a statement of fact is admitted by

the opposing party, the court will only reference the initiating document.

---

[2]Because the admissions in each answer are identical, the court will only
reference the answer of Defendant Gallagher Bassett Services, Inc., unless
otherwise indicated.   (Docket 85).

[3]The court references the parties' submissions without quotation marks,
unless indicated.

2

These facts are "viewed in the light most favorable to the [party] opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The facts material to defendant's second motion for summary judgment are as follows.[4]

Plaintiff Annie Tovares works at Menards in Rapid City, South Dakota. On Wednesday, March 19, 2014, she fell at work. One of Menards' surveillance cameras recorded her fall.[5] Ms. Tovares did not hit her head, but she immediately felt dazed, disoriented and like her brain got jarred. Ms. Tovares told someone at work that she had fallen. (Docket 117-1 at p. 10:21-22).[6]

On March 19, 2014, a Menard's employee notified Gallagher Bassett Services, Inc. ("GBS") of Ms. Tovares' fall and possible injuries.[7] (Docket 116-2

---

[4]Many of the undisputed material facts were included in the court's order on defendants' first motion for summary judgment. (Docket 87 at pp. 4-14). For clarity, many of those undisputed facts will be incorporated into this order without reference to the record from which the facts were developed. Facts developed after the previous order will include a reference to the recently developed record.

[5]See Docket 47-6 (DVD in Clerk of Court file).

[6]The court cites to the page of the transcript in CM/ECF as opposed to the page of the transcript because the parties submitted different sections of the transcript.

[7]Defendant Praetorian Insurance Company ("Praetorian") issued a policy of worker's compensation insurance to Ms. Tovares' employer, Menards, Inc. GBS is the claim administrator which handled Ms. Tovares' claim for Praetorian. See Dockets 1 ¶ 38, 116 ¶ 2, 116-1 & 122-3.

at pp. 1-3).   Christina Manwaring was the adjustor assigned by GBS to handle Ms. Tovares' worker's compensation claim.[8]

The following Tuesday, Ms. Tovares had a bloody nose at work and that night she had blurry vision and a sharp ringing in her ears.   At work the following morning the lights hurt Ms. Tovares' eyes and head.   She felt dizzy and was worried something serious happened because of her fall.   She spoke to her supervisor and went to the emergency room at the Rapid City Regional Hospital in Rapid City, South Dakota.   After visiting the ER, Ms. Tovares went to see her ophthalmologist at Wright Vision Center.   As instructed by the ER physician, Ms. Tovares took a couple of days off work.

Ms. Tovares' bill for the hospital services, CT scan and ER activities totaled $2,513.   The bill from Wright Vision Clinic was $185.   Dakota Radiology billed Ms. Tovares $165.   She did not receive copies of the bills for these services until August 2014.   (Docket 117-1 at p. 13:11-14).

On March 26, 2014, after speaking with a Menard's employee, Ms. Manwaring noted "[e]mployee was sent to Rapid City Regional Hosp ER. . . . Rapid City Regional did a CT Scan today."   (Docket 116-2 at p. 3).   Ms.

---

[8]When used in the individual tense the phrase will be "worker's compensation" and in the group tense "workers' compensation," unless in a quotation.

Manwaring's notes of her telephone contact with Ms. Tovares on March 31, 2014, contain plaintiff's description of her incident at Menards:[9]

> She ws done, pulling a box off the cart, next she new she was on the floor.  She's not sure how it happened.  Thinks L. foot slipped, hit L. hip, L. underarm struck the box she was handling, and it was scraped and bruised.  Initially she was in so much pain she couldn't believe it.  The impact of her body hitting the concrete, maybe the weight of the box made her fall even harder.  She did not strike her head, however once she stood up, he whole body was vibrating.  She knows she jarred her brain.  She just stood there to try and re-gain her "marbles" says she was in shock.  Once the pain subsided, she felt fine.  She didn't have any broken bones.  Physically she feels fine.  A week later, she began experiencing lightheadedness and dizziness.  Equilibrium was off.  Numerous time of ringing in her head.  Went to doctor on 3/26, and doctor asked which ear was ringing, she couldn't tell.  Vision is slightly blurry and pain in her head.  She's been better the last few days.  Went to ER on 3/26/2013 b/c that morning when she went to work the bright lights in the building hurt her head and eyes.  While she was at ER, the did a CT scan.  They said everything was negative.  But she was highly disappointed in the hospital staff.  Never asked to see her bruises, no x-rays of her body were done.  She felt like they didn't believe what happened to her.  Up until that day, she had had a sharp ringing in her head, then went away.  That night she had some minor ringing in head, so she knows she jarred her brain and she knows that can cause problems down the road.  She had a minor cold about a month ago.  Does not suffer from allergies/sinus issues.  She did receive a call the next day to see how she was feeling.  FU with optimologist [sic] on 3/26/2014 and told her everything looked fine.  She was concerned about the lens being dislodged.

(Docket 67-2 at p. 10; <u>see</u> <u>also</u> Docket 116-2 at p. 4).

---

[9]All notes, correspondence and medical records are reported verbatim without correction or clarification.

March 26, 2014, ER records obtained by GBS contain the following history of Ms. Tovares present illness:

> Patient is a 64-year-old female who presents with blurred vision. She states that a week ago she fell and landed on her left hip and left elbow.   She denies shooting [sic] her head at that time.   Over the past week since the fall she has had intermittent blurred vision and ringing in her years.   She has also had an intermittent sharp headache but has not required medication as the heading duration he was very brief.   She denies numbness, tingling, or weakness. No vertigo or lightheadedness.   She denies pain otherwise.   A month ago she saw ophthalmology and they stented her left tear duct for dry eye.

(Docket 67-2 at p. 57).   A CT scan of Ms. Tovares' head reported "[v]entricles and sulci are normal.   There is no intracranial hemorrhage or mass.   No bony abnormality identified."   (Docket 67-2 at p. 58).   The CT report concluded "[n]ormal CT head."   Id.   ER physician charted "I offered to obtain an MRI but she declined.   The most likely cause of her symptoms is that they are related to a head injury.   She is comfortable with discharge and will follow up with her primary physician."   (Docket 67-2 at p. 59).   An instruction sheet given to Ms. Tovares at discharge from the ER contained the following caution:

> You have had a head injury which does not appear serious at this time.   A ***concussion*** is a state of changed mental ability, usually from a blow to the head.   You should take clear liquids for the rest of the day and then resume your regular diet.   You should not take sedatives or alcoholic beverages for 48 hours after discharge.   After injuries such as yours, most problems occur within the first 24 hours.

Id. at p. 45 (emphasis in original).   The "minor symptoms" which may occur included "dizziness," "headaches" and "double vision."   Id. (capitalization omitted).

GBS's claim file noted on April 1, 2014, Ms. Tovares was seen at Wright Vision Center on March 26, 2014.   (Docket 116-2 at p. 5; see also Docket 116-4).   Wright Vision Center listed her medications as: "acyclovir, 400 mg tablet, Dexilant 30 mg, delayed release, Pred Forte 1% Eye Drops[.]"   (Dockets 67-2 at p. 49 and 118 ¶ 16).

On April 8, 2014, Ms. Manwaring noted the insurance in this case was Praetorian's workers' compensation policy for the period November 1, 2013, to November 1, 2014.[10]   (Docket 116-2 at p. 5).   The same day, Ms. Manwaring noted in the claim file that "[c]ompensability is undetermined.   Claimant has indicated she did not hit her head in her fall, however she presented to ER with concussive symptoms one week later.   Full medical records have been requested, but not yet received."   Id. at p. 6.

_____

[10]See also Dockets 108-1 & 122-4.   While defendants oppose plaintiff's use of page 3 of Docket 122-4, defendants produced the same three pages as part of their supplemental response to plaintiff's motion to compel.   See Docket 108-1.   Defendants inferentially raise a claim that Praetorian is not the proper defendant because "QBE had purchased Praetorian."   (Docket 129 at p. 10) (referencing Docket 116-2 at p. 5).   That claim is inconsistent with defense counsel's representation in her declaration producing the three pages of the insurance policy.   (Docket 108).   There is no reference to QBE in the declaration or insurance policy.   Defendants' inferential claim will not be considered.

7

On April 10, 2014, Ms. Manwaring noted in the claim file that the "[r]eserves are appropriate for probable ultimate cost.   No changes are warranted at this time.   Claimant has not lost anytime from work and medical reserves reflect conservative care."   Id. at p. 7.   Regarding resolution and closure of the claim file, Ms. Manwaring noted "[o]nce claimant is placed at MMI [maximum medical improvement], file can be prepared for closure as no permanency is anticipated.   File closure may be viable within 90 days if claimant reaches MMI in the near future."   Id.   Her recommendations for management of the claim file included the following:

1.   Build rapport with claimant to avoid litigation.

2.   Obtain updated medical reports and outline recommended treatment plan in the file.   Push for eventual MMI release.

3.   Document completion and submission of all state forms and filings.

4.   Complete initial investigation and document compensability decision in the file notes in 010 note.

5.   Complete updated POA no later than 5/6/14.

Id.

On April 21, 2014, Ms. Manwaring received a copy of the Regional Hospital ER records, including the CT report.   (Docket 67-2 at pp. 54-62; see also Dockets 116-2 at p. 8 & 118 ¶ 9).   On April 23, 2014, Ms. Manwaring sought permission to deny Ms. Tovares' claim.   In that request, she stated:

Left side contusions. The location indicted claimant had significant bruising on her left side, however she did not strike her head.

8

> Claimant presented to the ER one week later complaining of double vision and indicated she felt she had a head injury from her fall. The claimant maintains she did NOT hit her head when she fell. The ER notes indicate her complaints are likely from a head injury. Claimant was referred to eye doctor for FU due to blurred vision. These notes have also been received and indicate the claimant had had her tear ducts stinted one month prior as well as previous cataract surgery. There were no issued found. Requesting authority to deny file based on claimant's treatment appearing to have no relation to her work incident.

(Docket 116-2 at p. 9) (capitalization in original).   Ms. Manwaring's supervisor, Angela Smith, agreed.   "Reviewed the file with adjuster and agree with recommendation for denial due to the head complaints not being related to her work incident. . . . The ER notes indicate her complaints are likely from a head injury. . . . Review and approval of the denial sent to ABM [Assistant Branch Manager], Dorothy Stolle this date."   Id. at p. 10.   On April 29, 2014, Ms. Stolle authorized closing the file.   "Agree with denial of file at this time as medical diagnosis does not relate to work injury."   Id. at pp. 10-11.

On April 30, 2014, Ms. Manwaring sent Ms. Tovares a letter on GBS letterhead.   (Docket 116-1).   The letter stated:

> Gallagher Bassett Services is the Workers' Compensation Administrator for the above captioned client.   We are in receipt of your claim for Workers' Compensation benefits due to an alleged injury from an alleged accident on or about 3/19/2014.
>
> We have investigated this claim and found no evidence to support your claim for benefits under South Dakota Workers' Compensation provisions.
>
> We must, therefore, accordingly deny your claim.
>
> Please call this office if you have any questions.

Id.

9

When Ms. Tovares read the letter from GBS she "was highly upset, especially after I looked in the dictionary and found out the definitions, because I felt highly insulted.   I felt like my integrity was being hurt by those words because basically I was being called a liar.   I did not lie about this situation."   (Docket 117-1 at p. 14:4-10).   She testified:

> In my mind a false statement is that they investigated my claim and found no evidence to support my claim. . . . I believe that that is a false statement.   If they actually did their job and if they actually watched the video, if they actually read my medical records, then how could they claim that they investigated and found no evidence to support my claim?

(Docket 122-1 at pp. 16:19-17:1).   Ms. Tovares understood she was not going to have any financial benefit from the worker's compensation policy for her on-the-job injuries.   Id. at p. 21:7-18.   Ms. Tovares believed from this letter that workers' compensation was not going to pay her medical bills.   (Docket 117-1 at p. 12:15-22).

On May 6, 2014, Ms. Manwaring received and reviewed the video surveillance of Ms. Tovares' fall.   (Docket 116-2 at p. 11).   She noted in the claim file "[t]he claimant tripped over the bottom shelf and fell on her rear, hitting the shelf with her arm.   She did not strike her head."   Id.   Ms. Manwaring again noted for the file, "[a]s the claimant did not strike her head in her fall, and no evidence of a concussion was notated, the file has been denied."   Id. at p. 12.

In August 2014, Ms. Tovares received the March ER and CT bill. (Dockets 118 ¶ 31 & 117-1 at p. 13:11-14).   Ms. Tovares borrowed money to pay the medical bills by taking out a loan on her credit card.   (Docket 122-1 at pp. 6:25-7:1).   In addition to borrowing money, Ms. Tovares had to pay a cash advance fee of more than $100 but less than $200.   (Docket 117-1 at p. 13:1-6).

While there were communications between Ms. Manwaring and Ms. Tovares' attorney, Michael Simpson, beginning in May 2014, on October 20, 2014, Attorney Simpson filed a petition for hearing with the South Dakota Department of Labor and Regulation, Division of Labor and Management, Workers' Compensation on Ms. Tovares' behalf.   On November 12, 2014, Praetorian filed an answer admitting Ms. Tovares fell on March 19, 2014, and that she sought medical attention on March 26, 2014.

Following a series of negotiations between Attorney Simpson and Attorney Daniel Ashmore representing Praetorian, on March 9, 2015, Attorney Ashmore tendered a check for $3,225.12 to Attorney Simpson.   On March 12, 2015, Attorney Simpson mailed an executed notice of dismissal with prejudice to the South Dakota Department of Labor and Regulation, Division of Labor and Management.   There are no unpaid medical benefits owed to Ms. Tovares under the South Dakota Workers' Compensation Act.

No one from either GBS or Praetorian provided Ms. Tovares with a copy of the workers' compensation insurance policy or told her the terms of

coverage.   (Docket 117-1 at pp. 15:11-14 & 17-24 & 16:22-15).   Ms. Tovares

never personally asked for a copy of the policy.   Id. at p. 15:15-16.

The Menard's insurance policy with Praetorian contained the following

endorsement:

> SOUTH DAKOTA MANAGED CARE ENDORSEMENT
>
> This endorsement applies only to the insurance provided by the
> policy because South Dakota is shown in Item 3.A. of the
> Information Page [Docket 122-4 at p. 1].
>
> This endorsement provides for the payment of benefits under the
> workers compensation law of South Dakota to provide medical
> services and health care to injured workers for compensable injuries
> and diseases by means of a managed care program which meets the
> requirements established by the Department of Labor.

(Docket 122-4 at p. 2).

## ANALYSIS

Plaintiff's complaint alleges one surviving cause of action against the

defendants, that is, count II, misrepresentation.   (Docket 1 at pp. 6-7).   In

addition to compensatory damages and attorney's fees, the complaint seeks

punitive damages.   Id. at p. 8.

Defendants' second motion for summary judgment asserts count II must

be dismissed because "[t]he evidence . . . establishes, as a matter of law, that

no valid misrepresentation cause of action exists under SDCL § 58-33-5."

(Docket 115 at p. 1).   They assert Ms. Tovares' "[c]omplaint solely relies on the

April 30, 2014 letter as the basis for the misrepresentation claim. . . . This

letter is the only conduct that can form the basis of Plaintiff's claim."[11]   Id. at

p. 4 (referencing Docket 1 ¶¶ 51-58).   Defendants argue "this Court may grant

summary judgment for Defendants because reasonable minds cannot differ as

to whether the April 30, 2014 denial letter is actionable under SDCL § 58-33-

5."   Id. at p. 3.

Referring to the statutory language, defendants argue "[t]he only

conceivable ground of recovery under SDCL § 58-33-5 would be for

misrepresentation of the terms of the insurance policy.   The statute pertains to

making a false statement regarding the actual policy, not about facts of a

claim."   Id. at p. 5.   Defendants submit "[t]he use of the word 'alleged' in the

denial letter is an accurate use of Plaintiff's allegations and the use of the word

'alleged' cannot support a finding of liability under SDCL § 58-33-5."   Id. at

p. 9.   "[N]o reasonable mind could find that use of the word 'alleged' in the

April 2014 letter was inappropriate," according to the defendants because

"South Dakota law expressly provides that a claimant seeking workers'

compensation benefits must prove through medical evidence that an injury and

subsequent treatment are insured benefits."   Id.   Defendants argue the letter

"applied the evidentiary burden prescribed by the South Dakota workers'

---

[11]Defendants point out Ms. Tovares "has not developed any other basis
for her [misrepresentation] cause of action beyond the alleged statements in
this April 2014 letter, nor has she sought to amend her pleading to add any
other ground during the four years that this lawsuit has been pending before
the Court."   (Docket 115 at p. 4 n.2).

compensation statute and stated we 'found no evidence to support your claim for benefits.' "   Id. at p. 10.   In the defendants' view "[t]his is not a misrepresentation of the terms of an insurance policy.   It is simply a statement consistent with the Act's definition of a compensable injury."   Id.   In summary, defendants submit "SDCL § 58-33-5 does not involve a misrepresentation of 'facts' rather it addresses misrepresentation of policy terms."   Id. at p. 11.

As a separate basis for summary judgment for Praetorian, defendants contend "[t]he statute does not impute the conduct of one person to another." Id. at p. 12.   Because Praetorian is not the author, defendants submit "Praetorian did not 'make' a misrepresentation in the April 30, 2014 letter." Id.   "[T]he alleged representation took place between the plaintiff and someone other than the carrier," defendants argue so "the carrier could not be directly liable for the claim of misrepresentation."   Id.

Defendants' final argument is that plaintiff is not entitled to punitive damages as a matter of law on her misrepresentation claim.   Id. (referencing SDCL § 58-33-46.1).   They assert the language of the statute only permits "recovery of all actual and consequential damages suffered as a result of such act or practice including reasonable attorneys' fees to be set by the court."   Id. at p. 13 (citing SDCL § 58-33-46.1).   Defendants also argue plaintiff did not seek punitive damages on count II, as the punitive damages assertion is separately stated in paragraphs 59-60 of the complaint.   Id.   Defendants

14

conclude "[p]unitive damages were not demanded under the misrepresentation claim, nor are they available under the governing statute SDCL § 58-33-46.1." Id. at p. 14.

Plaintiff's response asserts misrepresentation under SDCL § 58-33-5 is not Ms. Tovares' only remaining claim.   (Docket 121 at p. 6).   Plaintiff contends the facts alleged in her complaint satisfy each of the elements of the following causes of action:

    (1)    intentional deceit under SDCL 20-10-2(1) (assertion of a fact by one who does not believe it to be true);

    (2)    negligent deceit under SDCL 20-10-2(2) (assertion of a fact by one who has no reasonable ground to believe it is true);

    (3)    common law fraud; [and]

    (4)    negligent infliction of emotional distress.

Id.

Plaintiff argues "[t]he well-pleaded facts alleged in the complaint, not the legal theories of recovery or legal conclusions identified therein, must be viewed to determine whether the pleading party provided the necessary notice and thereby stated a claim in the manner contemplated by the federal rules."   Id. at p. 7 (citing Topchian v. JPMorgan Chase Bank, 760 F.3d 843, 848 (8th Cir. 2014); internal citation omitted).   She submits "the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory."   Id. (citing Topchian, 760 F.3d at 849; internal citation omitted).   Ms. Tovares contends "a plaintiff need not plead fraud with complete

15

insight before discovery is complete."   Id. at p. 8 (brackets omitted; citing

Larson Mfg. Co. of South Dakota v. Connecticut Greenstar, Inc., 929 F. Supp.

2d 924, 937 (D.S.D. 2013); referencing Northwestern Public Service v. Union

Carbide Corp., 115 F. Supp. 2d 1164, 1171 (D.S.D. 2000); and Gunderson v.

ADM Services Inc., No. 4032, 2000 WL 1154423 at *3 (8th Cir. 2000)

(unpublished)).

Plaintiff points to the allegations of the complaint which support her

present assertions of deceit, fraud and negligent infliction of emotional distress.

Id. at pp. 10-11.   While plaintiff incorporates a number of the allegations into

her argument from count I, bad faith, that claim has been dismissed.   See

Docket 87 at pp. 25 & 36.   Considering the other allegations, plaintiff asserts

the following:

> Gallagher told Plaintiff in the denial letter of April 30, 2014 that "We
> have investigated this claim and found no evidence to support your
> claim for benefits under South Dakota Worker's Compensation
> provisions."   That representation was false.   (Docket 1 ¶ 52);
>
> Gallagher misrepresented the fact that they had conducted an
> investigation sufficient to make a determination to deny the claim.
> Id. ¶ 54;
>
> The attending physician's notes state that "the most likely cause of
> her symptoms is that they are related to a head injury."   Id. ¶ 18;
>
> Under established South Dakota law governing payment of worker's
> compensation benefits, "[w]henever the purpose of the diagnostic
> test is to determine the cause of a claimant's symptoms, which
> symptoms may be related to a compensable accident, the cost of the
> diagnostic test is compensable, even if it should be later determined
> that the claimant suffered from both compensable and non-

16

> compensable conditions." <u>Mettler v. Sibco</u>, 628 N.W.2d 722, 724
> (SD 2001).   <u>Id.</u> ¶ 23;[12]
>
> Gallagher, acting on behalf of Praetorian, misrepresented coverage
> and available benefits in violation of SDCL § 58-33-5, entitling
> plaintiff to recover her actual damages, including attorneys['] fees,
> pursuant to SDCL § 58-33-46.1.   <u>Id.</u> ¶ 51; and
>
> Defendants have acted with fraud, malice, or oppression, requiring
> an award of punitive damages to punish and deter such conduct.
> <u>Id.</u> ¶ 59.

(Docket 121 at pp. 10-11).   Plaintiff submits "[t]hese allegations meet the

elements of (1) false representations, (2) knowledge of falsity, (3) as well as lack

of reasonable basis to believe the statements were true."   <u>Id.</u> at p. 11.

Plaintiff argues the same allegations of her complaint also meet the

elements of deceit, fraud and negligent misrepresentation.   <u>Id.</u> at p. 12.

Finally, Ms. Tovares claims her "complaint alleges emotional distress caused by

defendants' conduct."   <u>Id.</u> at p. 13 (referencing Docket 1 ¶ 61).

Plaintiff contends the defendants are not unduly prejudiced because they

"have litigated each of these allegations since the first day of this lawsuit."   <u>Id.</u>

at p. 14 (referencing Docket 85 ¶¶ 25 and 41-61).   Asserting both of

defendants' motions for summary judgment denied any intentional

misstatements, plaintiff submits "[t]he fact that defendants are already

litigating and contesting each of these issues shows they are already on notice

of them."   <u>Id.</u> at p. 15.

---

[12]Defendants admit "such case exists but denies it is established law or a
complete statement of the law."   (Docket 85 ¶ 23).

Specifically addressing her misrepresentation claim under § 58-33-5, plaintiff argues "[d]efendants simply ask the Court to draw the inference most favorable to them by concluding the letter refers to something other than policy benefits, and to ignore any other inferences." (Docket 121 at p. 17). Plaintiff submits "[v]iewing the facts most favorably to the non-moving party, a jury could reasonably find that the April 30 denial letter misrepresented benefits available under the policy." Id. Plaintiff acknowledges "no one" representing the defendants "told her what benefits the policy would pay . . . . The only representations defendants made to her concerned the benefits it would not pay." Id. at p. 20 (emphasis in original).

Plaintiff spends the vast remainder of her argument focusing on GBS misrepresenting its authority to act as Praetorian's claim administrator. Id. at pp. 21-26. The court is not compelled to address this portion of plaintiff's argument as it is not relevant to defendants' second motion for summary judgment. To the contrary, the court finds there is sufficient evidence in the record to show that GBS acted as Praetorian's agent in dealing with Ms. Tovares' worker's compensation claim.

In their reply, defendants oppose plaintiff's argument she is entitled to assert the additional causes of action first raised in Ms. Tovares' brief. (Docket 129 at pp. 1-4). Defendants argue "[t]he Court should disregard and give no weight to Plaintiff's attempt to assert new causes of action in a response brief three and one half years after filing of this litigation." Id. at p. 4.

18

Defendants contend plaintiff misinterprets and misapplies <u>Mettler</u>.   <u>Id.</u> at p. 6.   They submit "<u>Mettler</u> has no bearing on Plaintiff's SDCL § 58-33-5 misrepresentation claim. . . . a Plaintiff reporting a hip/elbow claim who then later self-diagnosed she must also have had a head injury, does not fall under the scope of <u>Mettler</u>."   <u>Id.</u> at pp. 6-7.   Because "[n]o invoices had been submitted to Defendants for payment," they assert the denial letter "simply stated that the claim was investigated and there was no evidence to support the claim for benefits."   <u>Id.</u> at p. 9 & n.7.

Contending "only direct misrepresentations fall under SDCL § 58-33-5," defendants argue Praetorian "could not be directly liable for another's representation under this specific statute."   <u>Id.</u> at p. 9 (referencing <u>Delka v. Continental Casualty Co.</u>, 748 N.W.2d 140 (S.D. 2008)).   Defendants claim "[t]here is no authority on this point inconsistent with <u>Delka</u>."   <u>Id.</u>

<u>PLAINTIFF'S ADDITIONAL CAUSES OF ACTION</u>

The court is not going to permit plaintiff to assert new causes of action not previously and clearly delineated in plaintiff's complaint.   This case has been aggressively litigated for over three years based on the two causes of actions laid out in plaintiff's complaint.   Ms. Tovares "cannot raise a new cause of action [in response to] . . . a motion for summary judgment."   <u>Plucker v. United Fire & Casualty Co.</u>, No. CIV. 12-4075, 2015 WL 5697334, at *6 (D.S.D. Sept. 28, 2015) (referencing <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004) ("Efficiency and judicial economy require that

19

the liberal pleading standards under . . . Rule 8(a) are inapplicable after
discovery has commenced.   At the summary judgment stage, the proper
procedure for plaintiff to assert a new claim is to amend the complaint in
accordance with Fed. R. Civ. P. 15(a).   A plaintiff may not amend her
complaint through argument in a brief opposing summary judgment."); Mueller
Pallets, LLC v. Vermeer Corp., No. CIV 09-4016, 2011 WL 4458833, at *3
(D.S.D. Sept. 23, 2011) (citing Gilmour with approval)).

SDCL § 58-33-5 AND MISREPRESENTATION

    SDCL § 58-33-5, which plaintiff alleges forms the basis for count II,
provides in pertinent part, "[n]o person shall make . . . or cause to be made any
. . . statement misrepresenting the terms of any policy issued . . . or the
benefits or advantages promised thereby . . . ."   Id.   Chapter 58–33 provides
a private right of action for damages for any insured claiming to have been
injured by an insurance company's unfair insurance practice.   See SDCL § 58-
33-46.1 ("Any person who claims to have been damaged by any act or practice
declared to be unlawful by this chapter shall be permitted to bring a civil action
for the recovery of all actual and consequential damages suffered as a result of
such act or practice including reasonable attorneys' fees to be set by the
court.").

    Page three of Praetorian's workers' compensation policy for Menards
includes a declaration that "Workers Compensation Law means the workers or
workmen's compensation law. . . of each state . . . named in Item 3.A. of the

Information Page. . . . We [Praetorian] will pay promptly when due the benefits required of you [Menards] by the workers compensation law." (Docket 108-1 at p. 3). Praetorian's obligation to promptly pay is based on the language of SDCL 58-20-6. That section provides:

> No [workers' compensation policy] shall be issued unless it contains the agreement of the insurer that it will promptly pay to the person entitled to compensation all installments of the compensation that may be awarded or agreed upon . . . . Such agreement shall be construed to be a direct obligation by the insurer to the person entitled to compensation, enforceable in his name.

Id.

Defendants ask the court to use Ms. Tovares' own words as the basis for granting their second motion for summary judgment on her misrepresentation claim. It is disingenuous for defendants to argue Ms. Tovares did not personally know if Ms. Manwaring properly investigated plaintiff's worker's compensation claim. For defendants to suggest the date of the letter was correct, Ms. Tovares' address was correct and the date of Ms. Tovares' fall was correct, does not make the content of the April 30, 2014, letter a fair and accurate statement. The court does not expect a lay person to know the statutory and industrial obligations of an adjuster in complying with South Dakota workers' compensation laws as those rights and benefits are incorporated into a workers' compensation policy of insurance. It is for a jury to decide whether defendants misrepresented the benefits to which plaintiff was entitled under South Dakota's workers' compensation laws.

21

Defendants' reliance on <u>Delka</u> for the assertion that Praetorian cannot be held responsible under § 58-33-5 is misplaced.   In <u>Delka</u>, the South Dakota Supreme Court held there was no liability under § 58-33-5 because the alleged misrepresentation did not occur between the injured employee plaintiff and the insurance carrier but between plaintiff and his employer.   <u>Delka</u>, 748 N.W.2d at 152).   That scenario is not present in Ms. Tovares' case.   Praetorian employs GBS to act as its third-party administrator in resolving workers' compensation claims.   The check issued by GBS states it was issued for Praetorian.   (Docket 122-3).   Defendants admitted as much in their amended answers to plaintiff's complaint.   <u>See</u> Dockets 1¶38, 85 ¶ 38 & 86 ¶ 38.   This is a classic principal-agent relationship.   The court finds as a matter of law the principal, Praetorian, is responsible for the acts of its agent GBS.   SDCL §§ 58-20-1, 59-1-4 and 59-6-1.

Defendants claim Ms. Tovares has not identified " 'what was obtained or given up [by the misrepresentation].' "   (Docket 115 at p. 5) (citing <u>Hill v. Auto Owners Ins. Co.</u>, No. CIV. 14-5037, 2015 WL 2092680, at *10 (D.S.D. May 5, 2015); brackets in original; internal citations omitted).   Because Ms. Tovares already incurred the medical expenses before the issuance of the April 30, 2014, letter, defendants argue she lost nothing by the alleged misrepresentation.   This argument is without merit.

A jury could reasonably find Ms. Tovares was compelled to borrow money, incur credit card fees and ultimately incur Mr. Simpson's worker's

compensation attorney's fees because of the alleged misrepresentation of Ms. Manwaring's letter on behalf of GBS.   Hill offers no support for defendants' arguments.

Defendants' argument there were no misrepresentations about the *policy* of insurance is the same argument defendants asserted in the first motion for summary judgment.   Compare Docket 115 at p. 10 (The letter "is not a misrepresentation of the terms of an insurance policy.   It is simply a statement consistent with the Act's definition of a compensable injury.") with Docket 63 at p. 16) ("None of the 'facts pled by Plaintiff . . . represent an actionable misrepresentation of the policy terms.").   The defendants' argument ignores the other purpose of § 58-33-5, that is, to prohibit misrepresentation regarding the *benefits* due under an insurance policy.

Defendants' second bite at the apple fails.   "Whether there was a misrepresentation by denial of entitlement to benefits or a misrepresentation of the benefits to which plaintiff may have been entitled, the issue remains a jury question."   Tovares v. Gallagher Bassett Services, Inc., CIV. 16-5051, 2017 WL 4041983, at *9 (D.S.D. September 17, 2017).   "[V]iewed in the light most favorable to the [plaintiff] opposing the motion," the court finds plaintiff has presented "sufficient evidence" to create a jury question.   Matsushita Elec. Indus. Co., 475 U.S. at 587.

Defendants' second motion for summary judgment on count II of plaintiff's complaint is denied.

23

PUNITIVE DAMAGES

In defendants' first motion for summary judgment, they argued plaintiff's punitive damage claim must fail because there was no proof defendants acted with actual or implied malice.   (Dockets 63 at p. 21 and 72 at p. 13).   The court rejected that argument finding "[a] claim for presumed malice can be shown by demonstrating a disregard for the rights of other[s]."   (Docket 87 at p. 35) (referencing Biegler v. American Family, 621 N.W.2d 592, 605 (S.D. 2001)).

In defendants' second motion for summary judgment, they now argue plaintiff's complaint separately captioned a claim for punitive damages in paragraphs 59 and 60.   (Docket 115 at p. 13).   By this separation in the complaint, defendants submit "Tovares did not ask for punitive damages under her misrepresentation claim."   Id.   Yet, defendants acknowledge there is no "independent cause of action for punitive damage[.]"   Id. at p. 14 (citing O'Neill v. O'Neill, 876 N.W.2d 486, 496 (S.D. 2016)).   A fair reading of plaintiff's complaint demonstrates she is seeking punitive damages on both the bad faith claim, which was dismissed, and the misrepresentation claim.   Fed. R. Civ. P. 8(a)(3) ("A pleading that states a claim for relief must contain . . . a demand for the relief sought, which may include relief in the alternative or different types of relief.").

Defendants' second assertion is that the damages recoverable for a violation of § 58-33-5 are limited to the statutory damages articulated in SDCL

24

§ 58-33-46.1.   They assert those are "actual and consequential damages" and "reasonable attorneys' fees."   SDCL § 58-33-46.1.

In South Dakota, punitive damages are governed by statute.

In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, . . . the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

SDCL § 21-3-2.   Defendants ignore the clear language of SDCL § 21-3-2, which permits punitive damages "in addition to the actual damage[.]"   Id. (emphasis added).   Nothing in § 58-33-46.1 declares the damages available by that section are the exclusive damages available.   Plus, it is clear that § 21-3-2 contemplates punitive damages may be awarded in addition to other statutory, actual damages.

The court previously held Ms. Tovares may be entitled to punitive damages for defendants' conduct in disregarding plaintiff's rights under SDCL § 58-33-5.   (Docket 87 at p. 36).   Nothing in defendants' second motion for summary judgment changes the court's earlier ruling.

Defendants' second motion for summary judgment on punitive damages is denied.

25

## ORDER

Based on the above analysis, it is

ORDERED that defendants' second motion for summary judgment

(Docket 114) is denied.

Dated May 6, 2020.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE